UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| CWEB LIQUIDATION, LLC | : | CASE NO. 17-54087-lrc |
| f/k/a CARRIERWEB, LLC | : | |
| | : | CHAPTER 11 |
| Debtor | : | |
| _____ | : | |

DISCLOSURE STATEMENT WITH REGARD TO
CHAPTER 11 PLAN OF LIQUIDATION
JOINTLY SUBMITTED BY:

CWEB LIQUIDATION, LLC f/k/a CARRIERWEB, LLC
DEBTOR AND DEBTOR IN POSSESSION
and
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF CWEB LIQUIDATION, LLC f/k/a CARRIERWEB, LLC

June 25, 2019

Attorneys for CWeb Liquidation, LLC
f/k/a CarrierWeb, LLC
G. Frank Nason, IV
Georgia Bar No. 535160
LAMBERTH, CIFELLI,
 ELLIS & NASON, P.A.
1117 Perimeter Center West
Suite N313
Atlanta, Georgia 30338
(404) 262-7373

Attorneys for Official Committee of
Unsecured Creditors
Bradford J. Sandler
(DE Bar No. 4142)
Colin R. Robinson
(DE Bar No. 5524)
PACHULSKI STANG ZIEHL
& JONES LLP
919 North Market Street
17th Floor P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
(302) 652-4100

Henry F. Sewell, Jr.
Georgia Bar No. 636265
LAW OFFICES OF HENRY F. SEWELL,
JR., LLC
2964 Peachtree Road NW, Suite 555
Atlanta, Georgia 30305
Direct: (404) 926-0053

# Disclaimer

*All Creditors and Shareholders are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. The Plan, summaries, and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits, and the Disclosure Statement as a whole.*

*This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws. This Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed on the accuracy or adequacy of the statements contained herein. This Disclosure Statement was prepared to provide holders of Claims and Interests in the Debtor with "adequate information" (as defined in the Bankruptcy Code) so that they can make an informed judgment about the Plan.*

*As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute nor be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.*

*The information contained in this Disclosure Statement is included herein for the purpose of providing information of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to the Plan.*

*This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor and any party, nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtor; provided, however, that in the event the Debtor defaults under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default.*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                          :
                                                :
CWEB LIQUIDATION, LLC                           :        CASE NO. 17-54087-lrc
f/k/a CARRIERWEB, LLC                           :
                                                :        CHAPTER 11
            Debtor                              :
_____         :

## I.    Introduction and General Information

This "Disclosure Statement with Regard to Chapter 11 Plan Jointly Submitted by: CWeb Liquidation, LLC f/k/a CarrierWeb, LLC, Debtor and Debtor in Possession and The Official Committee of Unsecured Creditors of CWeb Liquidation, LLC f/k/a CarrierWeb, LLC" (the "Disclosure Statement") is submitted by CWeb Liquidation, LLC f/k/a CarrierWeb, LLC (the "Debtor") and the Official Committee of Unsecured Creditors of CWeb Liquidation, LLC f/k/a CarrierWeb, LLC (the "Committee"), to provide information to parties in interest about the "Chapter 11 Plan Jointly Submitted by: CWeb Liquidation, LLC f/k/a CarrierWeb, LLC, Debtor and Debtor in Possession and The Official Committee of Unsecured Creditors of CWeb Liquidation, LLC f/k/a CarrierWeb, LLC" (the "Plan") filed jointly by the Debtor and the Committee. This introductory section is qualified in its entirety by the detailed explanations which follow and the provisions of the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition history and significant events that have occurred during the Debtor's Chapter 11 Case. This Disclosure Statement also describes the Plan, alternatives to the Plan, and effects of confirmation of the Plan. In addition, this Disclosure Statement discusses the confirmation process.

*This Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, events in the Debtor's Chapter 11 Case, and financial information. Although the Debtor and the Committee believe that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. The Debtor's management provided the factual information contained in this Disclosure Statement unless otherwise specifically noted. The Debtor and the Committee are unable to warrant or represent that the information contained herein, including the financial information, is without any inaccuracy or omission. The Debtor has not subjected the financial data set forth herein to an independent audit.*

*Nothing contained herein shall (1) constitute an admission of any fact or liability by any party, (2) be admissible in any non-bankruptcy proceeding involving the Debtor or any other*

*party; provided, however, that in the event the Debtor defaults under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default, or (3) be deemed conclusive advice on the tax or other legal effects of the Debtor's Plan as to Holders of Claims or Interests.  You should consult your personal counsel or tax advisor on any questions or concerns regarding tax or other legal consequences of the Plan.*

*Except for historical information, all the statements, expectations, and assumptions, including expectations and assumptions contained in this Disclosure Statement, are forward looking statements. Although the Debtor and the Committee have used their best efforts to be accurate in making these forward looking statements, it is possible that the assumptions made ay not materialize.*

Parties voting on the Plan should read both the Plan and this Disclosure Statement.

### A.    Definitions

Unless otherwise defined, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.

### B.    The Disclosure Statement

The primary purpose of this Disclosure Statement is to provide parties with adequate information so that they can have a reasonable understanding of the Plan and the respective rights of the Debtor and each Creditor and Interest Holder.

The Bankruptcy Court has approved this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein, nor an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind the Debtor, the Committee, and all Holders of Claims against and Interests in the Debtor, whether or not they are entitled to vote.  Thus, you are encouraged to read this Disclosure Statement carefully.  This Disclosure Statement contains important information about the Plan, the method and manner of payments under the Plan, and developments concerning the Chapter 11 Case.

## II.  Voting on the Plan and the Confirmation Process

### A.  Voting

Only a Holder of an Allowed Claim classified in an impaired Class is entitled to vote on the Plan.  Under § 1124 of the Bankruptcy Code, a Class is impaired under the Plan unless the Plan (1) leaves unaltered the creditor's legal, equitable, and contractual rights, or (2) cures any defaults under the creditor's contract, reinstates its maturity, compensates the creditor for damages, and does not otherwise alter the creditor's rights.

In order to have an Allowed Claim you must (1) have timely filed a proof of claim, or (2) been listed in the Schedules as having a Claim that is not contingent, unliquidated or disputed. You are not required to file proof of your Claim if your Claim is listed by the Debtor in the Schedules and is not shown as being contingent, unliquidated or disputed.  If your Claim was scheduled as contingent, unliquidated or disputed and you have not filed a proof of claim, you do not have an Allowed Claim, cannot vote, and will not participate in any payments under the Plan until your Claim becomes an Allowed Claim.

Only Holders of Allowed Claims in an impaired Class may vote on the Plan. Creditors whose Claims are unclassified or unimpaired may not vote. Under the Plan, Administrative Expense Claims, Professional Fee Claims, Post-Confirmation Administrative Expense Claims, and Priority Tax Claims are unclassified and not entitled to vote on the Plan. Under the Plan, Class 1 is impaired and eligible to vote on the Plan. Class 2 is unimpaired and ineligible to vote on the Plan.

### B.  Voting Instructions

A ballot with voting instructions is being distributed with this Disclosure Statement. Please read the instructions carefully to ensure that your vote will count.

The Disclosure Statement, the form of Ballot, and the related materials delivered together herewith (collectively, the "Solicitation Package"), are being furnished to Holders of Claims in Class 1 for the purpose of soliciting votes on the Plan. If you did not receive a Ballot in your Solicitation Package, and believe that you should have received a Ballot, please contact, Lamberth, Cifelli, Ellis & Nason, P.A., 1117 Perimeter Center West, Suite N313, Atlanta, Georgia, 30338, (404) 495-4468 (Attn: G. Frank Nason, IV).

IN ORDER FOR YOUR BALLOT TO COUNT, IT MUST BE RECEIVED WITHIN THE TIME INDICATED ON THE BALLOT AND THE BALLOT MUST CLEARLY INDICATE YOUR CLAIM, THE CLASS OF YOUR CLAIM, AND THE AMOUNT OF YOUR CLAIM.

BY ENCLOSING A BALLOT, THE DEBTOR AND THE COMMITTEE ARE NOT ADMITTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN, ARE NOT ADMITTING THAT YOUR CLAIM IS ALLOWED AS SET FORTH ON THE BALLOT, AND ARE NOT WAIVING ANY RIGHTS TO OBJECT TO YOUR VOTE OR YOUR CLAIM.

### C. Requirements of Confirmation

The Bankruptcy Court can confirm the Plan only if all the requirements of § 1129 of the Bankruptcy Code are met. Those requirements include the following:

1.  The Plan classifies Claims and Interests in a permissible manner;

2.  The contents of the Plan comply with the technical requirements of the Bankruptcy Code;

3.  The Plan has been proposed in good faith and not by any means forbidden by law;

4.  The disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan, as well as the identity, affiliations, and compensation to be paid to all officers, directors, and other insiders; and

5.  The principal purpose of the Plan is not the avoidance of tax or the avoidance of the securities laws of the United States.

### D. Confirmation Hearing

The Bankruptcy Court will schedule a hearing on confirmation of the Plan ("Confirmation Hearing") as will be set forth in the Order Approving Disclosure Statement and Notice of Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time without further notice except for announcement at the Confirmation Hearing or notice to those parties present at the Confirmation Hearing.

### E. Objections to Confirmation

As will be set forth in the Order Approving Disclosure Statement and Notice of Confirmation Hearing, any objections to confirmation of the Plan must be in writing, set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for the Debtor. The Order Approving Disclosure Statement and Notice of Confirmation Hearing contains all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

### F.  Acceptance or Rejection of the Plan and Cram Down

The Class containing your Claim will have accepted the Plan by the favorable vote of a majority in number and two-thirds in amount of Allowed Claims actually voting. In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if an Impaired Class accepts it and if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." If you hold a General Unsecured Claim, the Plan is fair and equitable if you receive property of a value equal to the allowed amount of your Claim or if no junior Class receives or retains anything under the Plan.

## III.    Description of the Debtor and Background.

The Debtor was founded as CarrierWeb, LLC, in 2004 to commercialize in the US territory a leading-edge mobile telematics system for the trucking industry similar to what had been developed by its parent company, e*freightrac, LLC, in Europe.  The Debtor was capitalized entirely by its founding interest holders, who provided necessary funding throughout the significant downturn of the industry in 2008-2010.  In 2011, the parent company sold its European operations and reinvested the proceeds to further develop the Debtor's US business. With the support of an investment bank, the Debtor sought additional Private Equity funding in 2013 and 2014.  The investment bank secured debt financing in 2014, but this financing was terminated in 2016 as a result of a change of policy of the lender, leaving the Debtor extremely underfunded.  While shareholders secured some additional "friends and family" support, the Debtor remained in a troubled financial situation and was forced into Chapter 11 when the debtor became two months delinquent with a critical vendor that threatened to terminate service.  In order to protect its customers, for whom this service was mission-critical, the Debtor's board opted to enter Chapter 11 on March 6, 2017.  With the help of debtor in possession financing as described below, the Debtor's business stabilized, picking up a large customer and continuing to grow the fleets of its existing customers. After several false starts with other potential partners, the Debtor consummated a sale of substantially all its assets to I.D. Systems, Inc. ("IDSY"), a NASDAQ-listed company, on January 30, 2019.

## IV.    The Bankruptcy Case

Payroll Issues: On March 7, 2017, the Debtor filed its "Emergency Motion for Order Authorizing Payment of Prepetition Employee Compensation and Benefits in the Ordinary Course of Business" (the "Payroll Motion"), seeking authority to pay or otherwise honor various employee-related prepetition obligations of the Debtor, including payroll due March 9, 2017, and March 23, 2017, along with appropriate taxes and contributions for insurance and 401(k). On March 10, 2017, the Bankruptcy Court entered an Order approving the Payroll Motion, which order was entered on the docket on March 13, 2017 (Doc. No. 12). Additionally, on August 29, 2017, the Bankruptcy Court entered an Order (Doc. No. 98) authorizing the Debtor to pay into the 401(k) plan withheld contributions totaling $10,000.85 and matching contributions totaling $18,415.49.

Appointment of Committee. The Committee was appointed in this case on or about March 27, 2017 (Doc. No. 21). The Committee consists of Performance Food Group, Inc., Nehemiah Holdings, LLC, and Trena J. Wade.

Professionals. On April 4, 2017, the Bankruptcy Court entered an order (Doc. No. 30) approving Lamberth, Cifelli, Ellis & Nason, P.A. ("LCEN") as counsel for the Debtor effective as of the Petition Date. There were no objections, so the Order became a Final Order approving the employment of LCEN as counsel for the Debtor. On May 12, 2017, the Bankruptcy Court entered an Order authorizing the employment of Pachulski Stang Ziehl & Jones LLP ("PSZJ") as counsel for the Committee (Doc. No. 49), and on May 15, 2017, entered an Order authorizing the employment of The Law Offices of Henry Sewell, Jr., LLC ("Sewell") as local counsel for the Committee (Doc. No. 50). On September 15, 2017, the Bankruptcy Court entered an Order authorizing the employment of Frazier & Deeter, LLC ("Frazier") as accountants for the Debtor (Doc. No. 109). Frazier's employment was for the preparation of 2015 and 2016 federal returns and state returns and provided for the payment of $14,000 to commence the engagement and $14,000 prior to delivery of the returns.

Bar Date. On May 4, 207, the Court entered an Order setting June 30, 2017, as the Claims Bar Date for general proofs of claim arising prior to the Petition Date and September 5, 2017, as the Claims Bar Date for governmental units.

DIP Financing. In order to ease cash flow and operate successfully pending a potential sale of the Debtor's assets and business, the Debtor sought a postpetition credit facility.

The Original Facility. On June 9, 2017, the Debtor filed its "Emergency Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364 and Granting Senior Liens, and (II) Scheduling a Final Hearing Pursuant To Federal Rule of Bankruptcy Procedure 4001(c) (the "Initial DIP Motion"; Doc. No. 59) pursuant to which the Debtor sought approval of a $650,000 DIP Facility secured by a first priority security interest and super-priority administrative claim status. On June 23, 2017, the Bankruptcy Court entered an "Interim Order Authorizing Financing and Granting Senior Liens" (the "Interim DIP Order"; Doc. No. 68) approving the interim relief sought in the Initial DIP Motion and authorizing the Debtor to borrow up to $250,000 from Wilmington Bridge Capital, LLC (the "Wilmington"). The Interim DIP Order granted the Wilmington a first priority security interest in all existing or after acquired property of the Debtor, excluding property or proceeds recovered by or on behalf of the Debtor or any Chapter 7 or Chapter 11 trustee of the Debtor of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code, including but not limited to Sections 544, 545, 547, 548, 549, or 550 thereof ("Chapter 5 Actions"). The Interim DIP Order granted Wilmington a super-priority claim. The Interim DIP Order further authorized the establishment and funding of an escrow account with Debtor's counsel (the "Professional Fee Trust"). To the extent the allowed fees and expenses of the Professionals are equal to or greater than the Professional Fee Trust, the Professional Fee Trust was free and clear of the Wilmington's security interests and super-priority claim. The security interests and super-priority claims are also subject to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and all statutory fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest under and 31

U.S.C. §3717 (the "UST Fees"), (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $15,000, and (iii) an amount not to exceed $100,000 in the aggregate (exclusive of, and not including, the Professional Fee Trust) for Professionals (the "Carve-Out").

On June 28, 2017, the Bankruptcy Court entered a "Final Order Authorizing Financing and Granting Senior Liens" (the "Wilmington DIP Order"; Doc. No. 71). The Wilmington DIP Order authorized the Debtor to borrow up to an additional $400,000 from Wilmington and granted Wilmington a first priority security interest in the all property of the Debtor, excluding Chapter 5 Actions, and a super-priority claim. The security interest and super-priority claim were subject to the rights of Professionals in and to the Professional Fee Trust and the Carve-Out.

The Second Facility. Wilmington was related to a party interested in acquiring the assets and business of the Debtor. Wilmington decided not to pursue an acquisition, however. The maturity date for the debt owed Wilmington was October 31, 2017, which had been extended by consent of Wilmington through December 30, 2017, and then through January 31, 2018. The Debtor continued to pay interest on the DIP Facility, but the maturity date was not extended. Subsequently, the Debtor was able to secure a replacement DIP credit facility with ILC Group, LLC ("ILC"), which was related to an entity with an interest in acquiring the assets and business of the Debtor. On July 12, 2018, the Debtor filed its "Emergency Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364 and Granting Senior Liens, and (II) Scheduling a Final Hearing" (the "ILC DIP Motion"; Doc. No. 124) pursuant to which the Debtor sought approval of a $650,000 DIP loan from ILC, secured by a first priority security interest and super-priority administrative claim status, in order to satisfy and replace the Wilmington facility.

On August 3, 2018, the Bankruptcy Court entered a "Final Order Authorizing Financing and Granting Senior Liens" (the "ILC DIP Order"; Doc. No. 138), which authorized the Debtor to borrow up to $650,000 from ILC and granted ILC a first priority security interest in the all property of the Debtor, excluding Chapter 5 Actions, and a super-priority claim. ILC's security interest and super-priority claim were subject to the rights of Professionals in and to the Professional Fee Trust. The ILC DIP Order further provided the liens and interests granted ILC were subject to (i) UST Fees, (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $15,000, and (iii) the Carve-Out. The maturity date for the ILC facility was December 31, 2018.

The ISDY Facility. The Debtor negotiated a letter of intent for the purchase and sale of its assets and business with IDSY. As part of the process, the Debtor and IDSY negotiated for the advancement by IDSY to Debtor $650,000.00 in order to satisfy and replace the debt owed the ILC. On January 10, 2019, the Bankruptcy Court entered its "Final Order Authorizing Financing and Granting Senior Liens" (the "IDSY DIP Order"; Doc. No. 171) which authorized the Debtor to borrow up to $650,000 from IDSY and granted IDSY a first priority security interest in the all property of the Debtor, excluding Chapter 5 Actions, and a super-priority claim. IDSY's security interest and super-priority claim were subject to the rights of Professionals in and to the Professional Fee Trust. The IDSY DIP Order further provided the

liens and interests granted IDSY were subject to (i) UST Fees, (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $15,000, and (iii) the Carve-Out (now reduced to $50,000). The maturity date for the IDSY facility was March 1, 2019, or earlier if a sale of the assets and business was consummated prior to such date.

The Professional Trust Escrow. Pursuant to the Wilmington DIP Order, the ILC DIP Order, and the IDSY DIP Order, a Professional Fee Trust has been established for the purpose of paying Professionals employed by the Debtor and the Committee. In order to facilitate and streamline the payment of professionals employed by the Debtor and the Committee, the Debtor filed its "Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals" (Doc. No. 83) seeking approval of procedures whereby counsel for the Debtor and the Committee may submit monthly statement and, in the event no objections are filed, receive eighty percent (80%) of the fees and one hundred percent (100%) of the expenses covered by the statements. On August 16, 2017, the Bankruptcy Court entered its "Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals" (the "Compensation Procedures Order"; Doc. No. 89) approving procedures for the payment of professionals from the Professional Trust Escrow. All fees and expenses, whether paid or not paid pursuant to the Compensation Procedures Order, are subject to Court approval upon proper application and hearing

The Debtor paid a total of $315,000 into the Professional Fee Trust. As authorized by the Court, Frazier has been paid $28,000 from the Professional Fee Trust. Pursuant to the Compensation Procedures Order:

    (i)      LCEN has submitted fee statements for services rendered through January 31, 2019, totaling $115,457 in fees and $8,429.53 in expenses and has been paid or is entitled to be paid $92,365.60 in fees and reimbursed $8,429.53 in expenses, of which amounts $7,717 was paid from the Debtor's prepetition retainer and the remaining balance paid from the Professional Fee Trust. The accrued and unpaid fees through January 31, 2019, total $23,091.40;

    (ii)     PSZJ has submitted fee statements for services rendered through July 31, 2018, totaling $109,856 in fees and $2,821.49 in expenses and has been paid or is entitled to be paid from the Professional Fee Trust $87,884.80 in fees and reimbursed $2,821.49 in expenses. The accrued and unpaid fees through July 31, 2018, total $21,971.20;

    (iii)    Sewell has submitted fee statements for services rendered through January 31, 2019, totaling $23,612.50 in fees and $584 in expenses and has been paid or is entitled to be paid from the Professional Fee Trust $18,890 in fees and reimbursed $584 in expenses. The accrued and unpaid fees through January 31, 2019, total $4,722.50.

After accounting for (i) the fees paid to Frazier, (ii) the amounts paid or payable to LCEN, PSZJ, and Sewell under the Compensation Procedures Order, and (iii) the accrued fees of LCEN, PSZJ, and Sewell that are accrued but not payable under the Compensation Procedures

Order, the balance of the Professional Fee Trust as of January 31, 2019, is $26,394.48, which is subject to payment of fees and expenses for LCEN and Sewell from and after January 31, 2019, and fees and expenses of PSZJ that are accrued and payable from and after July 31, 2018.

<u>Sale of Purchased Assets</u>. Prior to filing, the Debtor determined a sale of its assets and business as a going concern would be in the best interests of creditors and would likely result in a significant dividend to creditors. On or about April 29, 2014, G2 Capital Advisors, LLC ("G2") entered into an investment banking agreement with the Debtor and its related entities, including efreightrac, the holder of 72.72% of the Debtor's membership interests ("efreightrac") and efreightrac's foreign subsidiaries, pursuant to which G2 embarked on a multi-phased strategy, including (i) initial financing and capitalization, (ii) growth strategies and acquisitions, (iii) potential recapitalization, and (iv) strategic alternatives, including a sale of the domestic and foreign entities. The Debtor employed G2 as financial advisor and investment banker for the Debtor pursuant to an Order authorizing such employment entered August 17, 2017 (Doc. No. 90).

In the Bankruptcy Case, the DIP credit facilities were provided by interested parties, primarily through related entities. With respect to the ILC DIP facility, the Debtor had entered into a Letter of Intent that provided, among other things, for the providing of a DIP credit facility, the acquisition of substantially all assets and business of the Debtor, a standstill period of ninety (90) days, a provision regarding expenses, and a provision regarding confidentiality. On August 3, 2018, the Court entered an Order (Doc. No. 139) approving the immediate enforcement of certain provisions of the Letter of Intent, namely the standstill period, the expense provision, and the confidentiality provision.

After the standstill period expired, and with no agreement in place with ILC or its related entities, on or about December 20, 2018, the Debtor executed a Letter of Intent with IDSY for the acquisition by IDSY of substantially all of the Debtor's assets and business. The Letter of Intent contemplated the providing of a DIP facility to replace the ILC facility and further contemplated a purchase of $3,500,000, payable in the amount of $2,800,000 at closing (the "Closing Cash Payment") with an additional $700,000 payable provided CarrierWeb Services Ltd. ("CarrierWeb Ireland") successfully reinstates its good standing by May 1, 2019 (the "Restoration Payment").

On January 4, 2019, the Debtor filed its "Motion for Order (1) Approving Sale Free and Clear of Liens, Claims, and Encumbrances; (2) Approving Assumption and Assignment of Certain Executory Contracts; (3) Approving Procedures for Sale; and (4) Approving Procedures Regarding Assumption and Assignment of Executory Contracts and Unexpired Leases" (the "Sale Motion"; Doc. No. 160), requesting among other things approval of sale and bid procedures at an interim hearing (the Bid Procedures Hearing") and approval of IDSY as stalking horse with break-up fee protections. On January 8, 2019, the Debtor filed with the Bankruptcy Court an initial proposed "Asset Purchase Agreement" (the "APA") and followed up with a fully executed copy of the final APA (Doc. No. 169). Because the APA contemplated the assumption and assignment of executory contracts and unexpired leases (hereinafter, "Contracts and Leases"), the Debtor filed a Cure Notice (Doc. No. 170) setting forth the amounts the Debtor contended were payable in order to cure any defaults under the Contracts and Leases to be

assumed and assigned. The Bid Procedures Hearing was held on January 10, 2019. Following the Bid Procedures Hearing, the Bankruptcy Court entered an Order on January 11, 2019 (the "Bid Procedures Order"; Doc. No. 172) authorizing the Debtor to conduct, and approving the terms and conditions of, an auction (the "Auction"), establishing a date for the Auction, scheduling a Sale Hearing (as defined in the Bid Procedures Order), and approving, among other things: (i) certain Bid Procedures (as defined in the Bid Procedures Order); (ii) the form and manner of notice of the Auction and Bid Procedures; (iii) procedures relating to the Contracts and Leases; and (iv) payment of the Break-Up Fee and Reimbursement (as defined in the Bid Procedures Order).

AT&T Corp. and AT&T Mobility II, LLC (collectively, "AT&T") filed an objection to the Cure Notice (Doc. No. 178) and a limited objection to the Sale Motion (Doc. No. 179) (collectively, the "AT&T Objections"). Publix Super Markets, Inc. ("Publix") filed a response and limited objection to the Cure Notice (the "Publix Objection"; Doc. No. 180) (collectively, the AT&T Objections and the Publix Objections are referred to as the "Objections"). The Debtor received no competing bids and filed a "Notice of No Auction" on January 22, 2019 (Doc. No. 182). The Bankruptcy Court held the Sale Hearing on January 24, 2019. The Debtor, the Committee, and IDSY worked with AT&T and Publix and ultimately resolved the Objections. The resolution of the AT&T Objections included fixing the Cure Amount for AT&T. The resolution of the Publix contemplated the finalization and execution of a SIM Transfer Agreement and Shared Resources Agreement. On January 27, 2019, the Bankruptcy Court entered its "Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of the Debtor Outside the Ordinary Course of Business, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances, (C) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief" (the "Sale Order"; Doc. No. 184), approving the sale and the resolution of the Objections, as well as the use of the sale proceeds to pay or make reserve for payment of the IDSY DIP credit facility, the Cure Amounts, and U.S. Trustee fees.

The Debtor consummated the sale on January 30, 2019. From the $2,800,000 Closing Cash Payment, the Debtor paid the IDSY DIP debt totaling $653,494.63 and paid into the trust account of LCEN as the Debtor's counsel the sum of $2,146,505.37. In accordance with the Sale Order the Debtor paid from the Closing Cash Payment the AT&T Cure Amounts totaling $308,092.43 and paid the remaining Cure Amounts on the Contracts and Leases totaling $257,327.70. The Debtor also paid 4th quarter 2018 U.S. Trustee fees totaling $4,875. Pursuant to the "Order Authorizing Payment of Administrative Expense Claims" (Doc. No. 193), the Debtor paid from the Closing Cash Payment $46,617.64 to satisfy accrued operational expenses relating primarily to the final payroll. Pursuant to the "Order Authorizing Payment of Administrative Expense Claims" entered March 29, 2019, the Debtor further received authorization to pay from the Closing Cash Payment accrued postpetition vacation expenses totaling $159,217.10. The remaining balance of the Closing Cash Payment after all such payments is $1,370,375.50 (the "Net Sale Proceeds").

The Debtor received and reviewed the necessary financial statements for the reinstatement of CarrierWeb Ireland in good standing, The Audit Partner signed off and all necessary consents and signatures have been obtained. Reinstatement was approved by the

Ireland Court, and the Restoration Payment totaling $700,000 was received by the Debtor's counsel on April 22, 2019.

Name Change. Following consummation of the sale of the Purchased Assets, the Debtor changed its name to CWeb Liquidation, LLC f/k/a CarrierWeb, LLC and effected such change with the Georgia Secretary of State. The caption of this Bankruptcy Case has been amended accordingly.

## V.    Description of the Plan

### A.    Treatment of Claims and Interests

(1)    Administrative Claims.  Allowed Administrative Claims are not classified in this Plan and are treated as follows:

(a)    Payment of Allowed Administrative Claims.  Holders of Allowed Administrative Claims[1] other than Professional Fee Claims[2] will be paid in full in cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof. Other than quarterly United States Trustee's fees, which will be paid as they come due, and Professional Fee Claims, which may be filed at any time prior to entry of a Final Decree, any request for payment of an Administrative Claim arising on or before the Confirmation Date must be filed no later than the first Business Day that is twenty one (21) days after the Confirmation Date or such Administrative Claim will be forever barred. The Liquidating Debtor and the Committee have the right to object to the allowance of any Administrative Claim. The Debtor and the Committee anticipate that Allowed Administrative Claims (other than Professional Fee Claims) will consist of (i) postpetition sales taxes totaling $44,119.49 as follows: Alabama ($268.88), Arizona ($901.50), Florida ($8,433.74), Maryland ($115.97), Michigan ($1,482.29), Mississippi ($47.25), North Dakota ($273.78), New Jersey ($329.68), and Tennessee ($32,277.40); (ii) vendor Claims totaling $6,081.57 as follows: Citrix ($735), Frazier ($4,473), Iron Mountain ($85.87), RSI ($612.50), and WebEx ($175.20); and (iii) postpetition bonuses and commissions due employees totaling $54,500.

(b)    Payment of Professional Fee Claims. Professional Fee Claims with regard to the period prior to entry of the Confirmation Order will be paid in the amount awarded pursuant to orders of the Bankruptcy Court and will be paid in full in Cash as soon as practicable after the later of the Effective Date or the date such

---

[1] Claims specified in Section 503(b) of the Bankruptcy Code and referred to in Section 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses of preserving the estate and administering the Case that arose or accrued or that shall arise or accrue in the ordinary course of business during the period between the Petition Date and the Closing Date; (b) any Professional Fee Claim; and (c) any fee or charge assessed against the Debtor under 28 U.S.C. § 1930.

[2] Claims for compensation earned and reimbursement of expenses of attorneys, accountants, or other professionals employed by the Debtor or the Committee, with approval of the Bankruptcy Court

Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof.

(2)    <u>Treatment of Other Certain Unclassified Claims</u>. Other unclassified Claims are treated as follows:

(a) <u>Post-Confirmation Administrative Claims</u>. Post-Confirmation Administrative Claims, other than Post-Confirmation Professional Fee Claims, will be paid as the same come due, without the necessity of Bankruptcy Court approval. Upon motion of any party in interest, the Bankruptcy Court may review any payment of such Post-Confirmation Administrative Claims and, if appropriate, order the return or refund of any such payment. Until entry of a Final Decree, all Post-Confirmation Professional Fee Claims for period prior to the entry of a Final Decree will be subject to review by the Notice Parties. A party seeking payment of a Post-Confirmation Professional Fee Claim shall serve (by electronic mail or first class mail) its invoice on the Notice Parties. Unless one or more of the Notice Parties files an objection with the Bankruptcy Court within fourteen (14) days of the service of the invoice, the Reorganized Debtor will be fully authorized without an order of the Bankruptcy Court to pay, on a monthly basis, one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred.  If an objection is filed, then the Reorganized Debtor will still be fully authorized without an order of the Bankruptcy Court to pay, on a monthly basis, one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred that are not the subject to an objection. The Bankruptcy Court will retain jurisdiction over any objections to such fees and expenses that are filed and shall be authorized to determine whether to allow any disputed Post-Confirmation Professional Fee Claims following a hearing on no less than fourteen (14) days' notice to the parties to the dispute. Following entry of a Final Decree, Post-Confirmation Professional Fee Claims may be paid as they come due.

(b) <u>Fees of U.S. Trustee</u>.  Any pre-confirmation fees due to the United States Trustee will be paid by the Confirmation Date. Post-Confirmation fees due the United States Trustee will be paid on the date that such fees are due.

(c) <u>Treatment of Executory Contracts and Unexpired Leases</u>. Except as with respect to any obligation of the Debtor and IDSY arising under or in connection with the sale of the Purchased Assets pursuant to the Sale Order and arising under or in connection with all documents executed by the Debtor and IDSY in connection with such sale, Confirmation of the Plan will operate as a rejection of any executory contract or unexpired lease not assumed and assigned to IDSY pursuant to the Sale Order. Any claims for damages arising from such rejection must be filed no later than the first Business Day that is twenty one (21) days after the Confirmation Date.

(d) <u>Treatment of Priority Tax Clams</u>. Holders of Priority Tax Claims will be paid the Allowed Amount of their Claim in full on the Effective Date. Attached hereto as Schedule 2.04 is a schedule of the Holders of the Priority Tax Claims, the amounts

13

due thereon, and any anticipated objections thereto. In the event of unexpected delays in the payment of any Priority Tax Claim, interest on such Claim will be calculated as provided in Section 511 of the Bankruptcy Code. The Liquidating Debtor is required to timely file returns for and timely pay all postpetition taxes when due.

(3)    <u>Treatment of Classified Claims and Interests</u>.

<u>Class 1 (General Unsecured Claims)</u>. Class 1 consists of the Allowed General Unsecured Claims. On the Effective Date, the Holders of Allowed General Unsecured Claims (excluding any Claim of efreightrac) will receive Pro Rata their share of the funds in the Distribution Fund (as described below) until such Holders receive their Allowed Claims in full. Attached hereto as Schedule 3.01 is a schedule of the Holders of General Unsecured Claims, the Allowed Amount of such Claims, and any anticipated or filed objections thereto. Confirmation of the Plan will bind any Creditor for whom no amount is payable as set forth on Schedule 3.01, and any such Creditor will be entitled to no Distributions under the Plan.

<u>Class 2 (Interest Holders)</u>. Class 2 consists of the Interest Holders. The Interest Holders will retain their Interests in the Debtor as such Interests existed as of the Petition Date and will receive their Pro Rata Share of the funds in the Distribution Fund after payment of the Distribution(s) to the Holders of Class 1 Claims. To the extent an Interest Holder has an Allowed Claim against the Debtor, any Distribution from the Distribution Fund may be treated at such Holder's discretion as repayment of debt.

<u>Impairment</u>. Class 1 is impaired and eligible to vote on the Plan. Class 2 is unimpaired and ineligible to vote on the Plan.

**B.    Means for Funding the Plan**

<u>Management</u>. Except as otherwise provided below, upon Confirmation, sole and exclusive management and control of the Liquidating Debtor (defined as the Debtor from and after the Effective Date) will be vested in the Liquidating Agent pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, subject to the provisions of this Plan. The Liquidating Agent shall be selected by the Committee in its sole and absolute discretion and management of the Liquidating Debtor shall be vested with such Liquidating Agent in accordance with Article 4.02 of the Plan.

(a)    <u>Authority of Distribution Agent</u>.  The Liquidating Agent will be authorized and empowered, in his representative capacity and not individually, to act on behalf of the Liquidating Debtor, and to exercise the rights and powers, and perform the duties, of the Liquidating Debtor in accordance with the provisions of this Plan. Whenever, under the terms of this Plan or otherwise, the Liquidating Debtor is authorized or empowered to take any action or perform any duty, the Liquidating Agent will have exclusive and plenary authority to take such action or perform such duty for and on behalf of the Liquidating Debtor, subject to the provisions of this Plan. Until a Final Decree is entered, the Liquidating Agent will file on behalf of the Liquidating Debtor all required post-confirmation reports with the Office of

the U. S. Trustee and will pay all post-confirmation quarterly fees due the U. S. Trustee.

(b)    <u>Selection of Liquidating Agent</u>.  The initial Liquidating Agent shall be Brad Boe. Upon motion of any party in interest, the Bankruptcy Court for cause shown may designate some other person or entity to serve as Liquidating Agent. The Liquidating Agent shall be entitled to compensation and reimbursement of expenses in accordance with the standards applicable to professionals employed by a trustee set forth in Sections 330 and 331 of the Bankruptcy Code.

(c)    <u>Limitation on Liability of Liquidating Agent</u>.  The Liquidating Agent will not be liable for any act it may do or omit to do while acting in good faith and in the exercise of reasonable business judgment; nor will the Liquidating Agent be liable in any event, except for its own gross negligence or willful misconduct.  No recourse will be had, directly or indirectly, against the Liquidating Agent personally, by legal or equitable proceedings or by virtue of any statute or otherwise.

(d)    <u>Dissolution of the Debtor</u>. Following (i) entry of a Final Decree, (ii) completion of all Distributions from the Distribution Fund, and (iii) the completion of the Liquidating Agent's duties set forth in the Plan, the Liquidating Debtor will take such steps as are necessary to effect dissolution of the Debtor under Georgia law. The Liquidating Debtor will be authorized to reserve from any final Distribution such amounts reasonably necessary to pay Post-Confirmation Administrative Claims and Post-Confirmation Professional Fees associated with such dissolution. Notwithstanding any other provision herein, upon Confirmation R. Fenton-May, the Debtor's Manager and CEO, will remain Manager and CEO of the Liquidating Debtor, solely to effect such dissolution, and shall not receive compensation for any services rendered in connection with such dissolution.

<u>Establishment of Distribution Fund.</u> The Liquidating Debtor will establish a segregated escrow account to be known and designated as the Distribution Fund and will deposit in said account the Net Sale Proceeds, the Restoration Payment, and any funds in DIP bank accounts not expended or reserved for expenditure by the Confirmation Date. The funds in the Distribution Fund will be held in escrow for the sole and exclusive benefit of those parties entitled to Distributions therefrom. The Distribution Fund may from time to time be invested in short term certificates of deposit, short term treasury bills, or money market accounts, provided that such deposits or investments comply with the requirements of § 345 of the Bankruptcy Code. All interest earned shall be retained in the Distribution Fund. The Liquidating Debtor will be authorized to open such bank or other depository account or accounts as may be necessary or appropriate to carry out the provisions of the Plan.

<u>The Distribution Fund</u>. Funds in the Distribution Fund will be used to pay the following items in the priority indicated:

(1) First, to pay, or to make a reasonable reserve for payment of, any and all unpaid Administrative Claims and Professional Fee Claims;

(2) Second, to the Holders of Priority Tax Claims until such Holders receive the amounts set forth on Schedule 2.04;

(3) Third, Pro Rata to the Holders of General Unsecured Claims until such Holders receive in full the amounts as set forth in Schedule 3.01, subject to any necessary reserves provided herein; and

(4) Fourth, and only after the Holders of Class 1 Claims receive payment in full of the amounts provided in Schedule 3.01, Pro Rata to the Interest Holders

When calculating Distributions, the Liquidating Agent will make reserves for anticipated Post-Confirmation Administrative Claims, Post-Confirmation Professional Fees, and amounts otherwise payable on account of a Disputed Claim. The initial Distribution from the Distribution Fund will occur as soon as reasonably practicable after the Effective Date. If there are reserves for Disputed Claims as provided below, the final Distribution will occur as reasonably practicable after a Final Order is entered on the last pending Disputed Claim.

Disputed Claims. In the event that an objection to a Claim is pending so that the Claim is a Disputed Claim, the Liquidating Agent will not make any Distributions on account of such Claim until the Claim is an Allowed Claim. Once a Disputed Claim becomes an Allowed Claim, the Liquidating Agent will pay on account of such Allowed Claim all Distributions to which such Allowed Claim would have been entitled had the Claim been an Allowed Claim when such Distributions were payable.

## C.    General Plan Provisions

(1)    Claims Bar Date. (a) with respect to Administrative Claims that accrued or were incurred during the period commencing after the Petition Date but prior to the Confirmation Date (other than U.S. Trustee fees or Professional Fee Claims) the first Business Day that is twenty one (21) days after the Confirmation Date; or (b) with respect to general prepetition Claims for which a Proof of Claim is required to be filed, June 30, 2017; or (c) with respect to prepetition Claims of governmental units for which a Proof of Claim is required to be filed, September 5, 2017; or (d) with respect to rejection claims relating to any executory contract or unexpired lease rejected pursuant to the terms of this Plan, the first Business Day that is twenty one (21) days after the Confirmation Date.

(2)    Objections to Claims. The Liquidating Debtor will file objections to any Claim no later than thirty (30) days after the Effective Date (the "Claims Objection Deadline"), subject to the right of the Liquidating Debtor to seek entry of an order by the Bankruptcy Court, after notice and a hearing, further extending the period to file objections to Claims. Any objection to a Claim may be settled after the settling parties provide Designated Notice of the proposed settlement and there are no timely objections, and such Claim will become an Allowed Claim without (i) further notice to any parties, and (ii) without the approval of the Bankruptcy Court. In

the event of an objection, the Bankruptcy Court shall resolve the objection after notice and hearing.

(3)    Avoidance Actions and Causes of Action. Avoidance Actions and Causes of Action, other than rights, claims or causes of action of the Debtor against any individual officer or director that is an Insider (as defined in Section 101 of the Bankruptcy Code) and that is not retained or employed by IDSY, were included in the Purchased Assets acquired by IDSY. On March 6, 2019, the Committee and R. Fenton-May executed a Stipulation and Tolling Agreement Extending Statute of Limitations pursuant to which, among other things, the deadline for the filing of any Avoidance Actions or other similar actions against R. Fenton-May was extending through June 4, 2019. The Committee has not identified any such actions, and because the Restoration Payment has been received, the Committee will not prosecute any such actions.

(4)    Revesting of Assets.  All property of the estate will vest with the Liquidating Debtor on the Effective Date free and clear of Liens.

(5)    Joint and Several Liability.  Confirmation of the Plan will not affect the joint and several liability of any codefendant, co-obligor, guarantor, or other entity that may be liable with the Liquidating Debtor, and such liability will continue unabated to the extent of applicable non-bankruptcy law. Nothing herein will be deemed to affect any right of subrogation to which any guarantor may be entitled under applicable non-bankruptcy law.

(6)    Temporary Injunction.  The Confirmation Order will operate as an injunction against any acts against the Liquidating Debtor and its assets to initiate, prosecute, enforce, liquidate, collect or otherwise assert any Claim against the Liquidating Debtor and its assets except as provided in this Plan. Any act in violation of this provision will be null and void.

(7)    Employment of Professionals. The Liquidating Debtor and the Committee may employ the professionals employed by the Debtor and the Committee prior to the Effective Date. The Liquidating Debtor and the Committee shall be entitled to employ such additional professionals as may be necessary after the Effective Date.

(8)    Effect of Confirmation. This Plan will be binding on all parties in interest upon entry of the Confirmation Order. Notwithstanding any provision that may be interpreted to the contrary, Confirmation will not amend, modify, release, discharge, waive, or otherwise affect any obligation of the Debtor and IDSY arising under or in connection with the sale of the Purchased Assets pursuant to the Sale Order and arising under or in connection with all documents executed by the Debtor and IDSY in connection with such sale, it being the intent of the Plan that all Closing Obligations survive Confirmation and remain in full force and effect. Pursuant to Section 1141(d)(1) of the Bankruptcy Code, the Debtor will not receive a discharge upon entry of the Confirmation Order confirming the Plan.

## VI.    Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Interests, or within each Class. Significant tax consequences

may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any Creditor or Holder of an Interest are represented, implied, or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation.

THE PROPONENTS ASSUME NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

The receipt by a Creditor or Interest Holder of Cash or property in full or partial payment of its Claim or Interest may be a taxable event. To the extent that a portion of the Cash or the fair market value of any property received is attributable to accrued and unpaid interest on a Claim being paid, a Creditor may recognize interest income. A Creditor or Interest Holder may also recognize gain or loss equal to the difference between the sum of the amount of cash received and the adjusted basis in the Claim or Interest for which the Holder receives amounts under the Plan. Such gain or loss may be treated as ordinary or capital depending upon whether the Claim or Interest is a capital asset.

## VII.    "Best Interests" Test

In order to confirm the Plan the Bankruptcy Court must determine that the Plan is in the best interest of all Creditors that do not accept the Plan. The "Best Interest Test" requires that the Plan provide each member of each impaired Class a recovery that has a present value at least equal to the present value of the distribution that each Creditor would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor has liquidated its assets and proposed a Plan to Distribute the proceeds to Creditors. The Debtor could convert to Chapter 7 for purposes of effecting the Distribution. However, if the Debtor's Bankruptcy Case were converted to Chapter 7, a trustee would be appointed to administer the assets and distribute the proceeds in accordance with the legal priorities established under Bankruptcy Code. All expenses of the Chapter 7 case, including fees of the trustee, the attorneys' fees for the trustee's counsel, accountants, and other professionals appointed in the Chapter 7 case, are paid in full before any payments may be made on account of Administrative Claims in the Chapter 11 case, which in turn must be paid in full before any payments would be made to pre-petition Creditors.

The Proponents do not believe that Creditors will receive as much under Chapter 7 as they would under the Plan, because the Chapter 7 trustee would be paid a commission (based on

the amounts at play herein, the estimated trustee commission would be approximately $85,000. Additionally, the trustee would likely employ an attorney for Claims objections This would further reduce the amounts available for Creditors. Not only would a conversion to Chapter 7 reduce the amounts otherwise available to Creditors, but it also would delay Distributions to Creditors. In a Chapter 7, disbursements to Creditors are not generally made until the case is fully administered and after the Court approves a final report submitted by the Chapter 7 trustee. Accordingly, the Proponents believe Creditors and Interest Holders will receive a greater dividend and faster payment under the Plan than they would in a Chapter 7. The Proponents therefore believe that confirmation of the Plan will maximize Distributions and is in the best interest of Creditors and Interest Holders.

## VIII.   PURPOSE OF DISCLOSURE STATEMENT

This Disclosure Statement has been prepared and presented for the purpose of permitting you to make an informed judgment regarding the Plan. Please read the Plan in full and consult with your counsel if you have questions.  If the Plan is confirmed, its terms and conditions will be binding on all parties in interest. The Proponents believe that the Plan is in the best interest of the Creditors and Interest Holders.

## IX.    CONCLUSION

The Proponents believe the Plan is in the best interests of Creditors and Interest Holders and is feasible. Accordingly, the Proponents request that the Bankruptcy Court confirm the Plan.

Dated: June 25, 2019

LAMBERTH, CIFELLI,
ELLIS & NASON, P.A.

By:  _/s/ G. Frank Nason, IV_
G. Frank Nason, IV
Georgia Bar No. 535160

1117 Perimeter Center West
Suite N313
Atlanta, Georgia 30338
(404) 262-7373
(404) 262-9911 (facsimile)

Counsel for the Debtor

LAW OFFICES OF HENRY F. SEWELL, JR., LLC

By: */s/ Henry F. Sewell, Jr.*
     Henry F. Sewell, Jr.
     Georgia Bar No. 636265

2964 Peachtree Road NW
Suite 555
Atlanta, Georgia 30305
Direct: 404-926-0053
hsewell@sewellfirm.com

Counsel for the Official Committee of Unsecured Creditors

-and-

PACHULSKI STANG ZIEHL JONES LLP

By: */s/ Bradford J. Sandler*
     Bradford J. Sandler
     (DE Bar No. 4142)
     Colin R. Robinson
     (DE Bar No. 5524)

919 North Market Street
17th Floor P.O. Box 8705
Wilmington, DE 19899 (Courier 190801)
(302) 652-4100
bsandler@pszjlaw.com
crobinson@pszjlaw.com

Counsel for the Official Committee of Unsecured Creditors

**SCHEDULE 2.04**

**(Priority Tax Claims)**

**CarrierWeb LLC**
**Sales Taxes**

| Name of Creditor | POC # if received | Claimed $ | Disputed $ | Total Payable $ | |
|---|---|---|---|---|---|
| Alabama | | 16.96 | | 16.96 | |
| Arizona | | 1,301.48 | | 1,301.48 | |
| Florida - Sales and Use tax | 44 | 7,028.33 | (7,028.33) | 1,817.97 | Per Order (Doc. No. 237) |
| Florida - Communications tax | 45 | 37,888.44 | (37,888.44) | 0.00 | Per Order (Doc. No. 237) |
| Georgia | 6 | 3,268.19 | (3,268.19) | 0.00 | Hearing Scheduled 6/27/2019 |
| Idaho | | 59.58 | | 59.58 | |
| Kansas | | 309.04 | | 309.04 | |
| Maryland | | 818.29 | | 818.29 | |
| Michigan | | 3,921.29 | | 3,921.29 | |
| Mississippi | 49 | 67.09 | | 67.09 | |
| Missouri | | 275.14 | | 275.14 | |
| New Jersey | 47 | 2,140.03 | | 2,140.03 | |
| Ohio | 42 | 8,426.21 | | 8,426.21 | |
| South Carolina | 46 | 2,905.45 | | 2,905.45 | |
| Tennessee | 45 | 31,837.76 | | 31,837.76 | |
| Texas | 12 | 9,139.66 | | 9,139.66 | |
| Texas | 14 | 0.00 | | 0.00 | |
| Utah | | 30.83 | | 30.83 | |
| Washington | 50 | 645.28 | | 645.28 | |
| Wisconsin | 31 | 46.61 | | 46.61 | |
| IRS | 1 | 450.09 | | 450.09 | |
| Texas | 12 | 6,675.64 | | 6,675.64 | |
| TOTAL | | 117,251.39 | (48,184.96) | 78,884.40 | |



**SCHEDULE 3.01**

**(General Unsecured Claims)**

**CarrierWeb LLC**
**Vendor Payments**

| Name of Creditor | POC # if received | POF Amount | Dispute/ Adjust | Amount Payable $ | |
|---|---|---|---|---|---|
| $49 Registered Agent Services, Inc. | | 49.00 | | 49.00 | |
| Accellos | | 14,000.00 | (14,000.00) | 0.00 | Per Schedule Amendment  (Doc. No. 222) |
| Accountemps | 43 | 10,779.97 | | 10,779.97 | |
| Alabama Trucking Association | | 975.00 | | 975.00 | |
| Alan M. Wolf | | 384.00 | | 384.00 | |
| Allied Electronics | 27 | 2,453.40 | | 2,453.40 | |
| AMS Electronics Inc. | 7 | 29,225.82 | | 29,225.82 | |
| Avenues to Independence | | 250.00 | | 250.00 | |
| Baker Donelson | | 7,500.00 | | 7,500.00 | |
| BDO USA, LLP | 8 | 58,861.94 | | 58,861.94 | |
| Benton Global, LLC | | 7,045.13 | | 7,045.13 | |
| Brill Securities, Inc. | | 18,500.00 | | 18,500.00 | |
| CalAmp wireless Networks Corp. | | 888.61 | | 888.61 | |
| Citrix | | 1,470.00 | | 1,470.00 | |
| Coverall North America, Inc. | 26 | 349.00 | | 349.00 | |
| DK Technologies | 10 | 480.00 | | 480.00 | |
| Donald Durm | | 751.15 | | 751.15 | |
| FedEx | | 689.32 | | 689.32 | |
| Fitch, Even, Tabin & Flannery LLP | | 10,415.83 | | 10,415.83 | |
| FleetSavings | | 300.00 | | 300.00 | |
| Frazier and Deeter | | 0.00 | | 0.00 | |
| G2 Capital Advisors | | 92,081.18 | | 92,081.18 | |
| GGG Partners, LLC | | 6,387.50 | | 6,387.50 | |
| Hanover Insurance Co. | | 11,174.01 | | 11,174.01 | |
| IMTA | | 500.00 | | 500.00 | |
| Iron Mountain, Inc. | | 260.38 | | 260.38 | |
| Jim Gamache | | 163.17 | | 163.17 | |
| Kuehne & Nagel | | 2,078.18 | | 2,078.18 | |
| Lake Ridge Associates, LLC | | 1,651.00 | | 1,651.00 | |
| Louisiana Motor Transport Association | | 500.00 | | 500.00 | |
| Motis | 32 | 707,780.30 | | 707,780.30 | |
| North Carolina Trucking Association | | 1,198.00 | | 1,198.00 | |
| Ohio Trucking Association | 9 | 1,848.00 | | 1,848.00 | |
| Panavise Products, Inc. | 16 | 3,175.20 | | 3,175.20 | |
| Prime | 22 | 36,720.35 | (9,313.39) | 27,406.96 | Per order (Doc. No. 226) |
| Retirement Strategies, Inc. | | 1,250.00 | | 1,250.00 | |
| Robby Kettlehake - E | | 1,009.56 | | 1,009.56 | |
| Rousслyn Fenton-May - E | | 127,529.92 | | 127,529.92 | |
| Schrickel Capital Corp. | | 12,730.50 | | 12,730.50 | |
| Smith, Gambrell & Russell LLP | 11 | 23,094.50 | | 23,094.50 | |
| South Carolina Trucking Association | | 250.00 | | 250.00 | |
| Stoops Freightliner | 20 | 19,699.61 | | 19,699.61 | |
| SunTrust - Corporate Card | | 12,997.04 | | 12,997.04 | |
| Team One Logistics | | 1,331.77 | | 1,331.77 | |
| Tennessee Trucking Association | | 855.00 | | 855.00 | |
| Texas Trucking Association | | 1,000.00 | | 1,000.00 | |
| The ROITT Group | | 13,860.00 | | 13,860.00 | |
| TMW | | 4,500.00 | | 4,500.00 | |
| TMW Systems Inc. | | 1,200.00 | | 1,200.00 | |
| Transics International NV - Vendor | 30 | 6,376.00 | | 6,376.00 | |
| Travelers Indemnity | 29 | 0.00 | | 0.00 | |
| Truckload Carriers Association | | 1,685.00 | | 1,685.00 | |
| ULINE | 15 | 669.34 | | 669.34 | |
| UPS Freight | | 257.93 | | 257.93 | |
| UPS Supply Chain Solutions, Inc. | | 435.33 | | 435.33 | |
| Southern AG | | 4,260.56 | | 4,260.56 | |
| John Marous | | 104,495.15 | | 104,495.15 | |
| Tri Star Freight | 41 | 88,294.95 | (88,294.95) | 0.00 | Per Order (Doc. No. 224) |
| Venture Logistics | | 1,622.37 | | 1,622.37 | |
| New Hampshire | | 500.00 | | 500.00 | |
| New York | | 1,500.00 | | 1,500.00 | |
| Wisconsin | | 300.00 | | 300.00 | |
| **TOTAL** | | **$1,462,589.97** | **($111,608.34)** | **$1,350,981.63** | |

**CarrierWeb LLC**
**Employee Payments - Pre-Petition**
**As of January 30th 2019**

| | POC # if received | POF Amount | Paid under Court Order | Adjusted POC Amount | POC Dispute/ Adjust | Amount Payable | |
|---|---|---|---|---|---|---|---|
| Bryan Stefan | 38 | 43,534.00 | (8,461.54) | 35,072.46 | (9,870.10) | 25,202.36 | Per Order (Doc. No. 227) |
| Deanna K Newcomb | 25 | 6,565.00 | | 6,565.00 | | 6,565.00 | |
| Eric Lin | | | | | | 4,750.88 | |
| Greg Griffin | 4 | 1,096.15 | | 1,096.15 | | 1,096.15 | |
| Hamiel J Malnida | | | | | | 9,000.00 | |
| Jeffrey A Vickers | | | | | | 9,250.00 | |
| John Chima | 39 | 7,584.62 | (4,234.62) | 3,350.00 | (3,350.00) | 0.00 | Per Order (Doc. No. 225) |
| Keith T O'Brien | | | | | | 38,631.68 | |
| Louis Sangster | | | | | | 0.00 | |
| Robert W Kettlehake | 24 | 16,395.00 | | 16,395.00 | (8,828.50) | 7,566.50 | |
| Roy M Lancor | 17 | 13,768.08 | (7,408.08) | 6,360.00 | 6,452.40 | 12,812.40 | |
| Shad A Bell | | | | | | 14,500.00 | |
| Tommy Clark | 18 | 35,772.00 | (2,716.00) | 33,056.00 | | 33,056.00 | Per Order (Doc. No. 228) |
| Trena J Wade | 23 | 14,100.50 | | 14,100.50 | | 14,100.50 | |
| William J Newlands | | | | | | 73,317.70 | |
| William M Sharpe | 33 | 30,454.71 | (6,984.63) | 23,470.08 | | 23,470.08 | Per Order (Doc. No. 229) |
| Wyatt Sweat | | | | | | 7,000.00 | |
| | | | | | | | |
| Jim Gamache - Payroll | 35 | 429,162.49 | | | (307,488.41) | 114,854.57 | Hearing Scheduled 9/4/2019 |
| | | | | | | | |
| **Total Bonuses and Commissions** | | | | | **($323,084.61)** | **$395,173.82** | |